**Harold W. and Elizabeth MILLER, Plaintiff,**

v.

**UNITED STATES of America, Seldon R. Glenn, former Collector of Internal Revenue, and William M. Gray, Director of Internal Revenue, Defendants.**

**Civ. A. No. 2648.**

United States District Court, W. D. Kentucky, at Louisville.

Dec. 28, 1954.

Louis Seelbach, Albert Reutlinger, Middleton, Seelbach, Wolford, Willis & Cochran, Louisville, Ky., for plaintiffs.

J. Leonard Walker, U. S. Atty., Rhodes Bratcher, Asst. U. S. Atty., Louisville, Ky., for defendants.

SHELBOURNE, Chief Judge.

This case was tried to the Court March 4, 1954, and upon the evidence adduced at that trial, the pleadings and exhibits in the case, the Court makes the following—

Findings of Fact

1. The plaintiff Harold W. Miller, individually, seeks to recover $17,772.61, with interest, alleged income taxes, excess profits taxes and declared value excess profits taxes paid by him as the sole transferee and stockholder of the Melrose Manor Corporation for the years 1946 and 1947, and Harold W. Miller and Elizabeth H. Miller, husband and wife, jointly seek to recover $5,362.93, with interest, alleged income taxes paid by them for the years 1948, 1949 and 1950.

2. The Melrose Manor Corporation filed its Form 1120 and 1121 income and excess profits tax returns for the fiscal year ended May 31, 1947 and reported no income from the second mortgage notes involved herein.

The corporation was organized June 22, 1942, under the laws of the State of Kentucky, by Harold W. Miller, who had been its sole stockholder during its entire existence. Harold W. Miller was engaged in the building business and the forming of the corporation was for the purpose of building houses for defense plant workers under an emergency program. Some of the houses built were rented for a time, but in the fiscal years 1946 and 1947, most of the houses were sold. The sales were under a twenty-five year F. H. A. first mortgage plan, the corporation taking a second mortgage for the balance.

In 1946, forty houses were sold for a total of $285,141.78 on which second mortgage notes totaling $55,912.00 were taken. The second mortgages amounted to approximately 20% of the sales.

3. The Melrose Manor Corporation was dissolved April 30, 1947, and all of its assets, including the second mortgage notes totaling $66,734.56 were transferred to Harold W. Miller, as transferee of the corporation and its sole stockholder.

The corporation reported no income from its second mortgage notes for the fiscal year 1946 and the period ended April 30, 1947, for the alleged reason that the second mortgages had no fair market value during 1946 and 1947. Harold W. Miller reported this transaction in his 1947 tax return, and for that year and all subsequent years, has made returns, computed and paid the tax on the basis that the notes had no fair market value when received on March 26, 1947. In each instance, every one of the second mortgages in question was inferior to a first mortgage, based on ninety percent of the appraised value of the property offered as security, amortized over a twenty-five year period. No first mortgage was in existence prior to 1942 and in most instances, the first mortgages were created in the years 1943, 1944 and 1945.

4. The Commissioner of Internal Revenue determined that the second mortgage notes held by the corporation at the end of the fiscal year 1946, in the total amount of $55,912 had a fair market value of twenty-five percent of their face value and assessed a deficiency in tax in the amount of $13,978. Harold W. Miller, as transferee, paid the deficiencies and interest assessed against the corporation for the fiscal year 1946 in the total sum of $13,139.25 and on July 31, 1952, timely filed a claim for refund for the same amount. He admits that, as sole transferee of the assets of the corporation, he is liable for any tax deficiencies due by it for 1946. He based his right to recovery for that year upon the sole contention that the second mortgage notes had no fair market value during the fiscal year 1946 and therefore the corporation had no taxable income for that year.

In the fall of 1946, Harold W. Miller testified, that desiring to consolidate his financial position, he caused both Melrose Manor Corporation and the

Will B. Miller Company, both of which corporations he controlled, to offer for sale all of the second mortgage notes held by both corporations. This offering was made to banks, investment houses, mortgage companies, and real estate brokers. Without exception, the replies he received were that none of them was interested in purchasing the notes and they believed no market could be found for them. Miller, who had been in the real estate business for over thirty years and three disinterested witnesses, who likewise were experienced real estate dealers, testified that none of the second mortgage notes held by the Melrose Manor Corporation during the period June 1, 1945 to May 31, 1946, and March 26, 1947, had any fair market value.

No witnesses or other proof were offered by defendants to show the basis for its contention that the notes had a market value of twenty-five percent or any value.

5. For the year 1947, the Commissioner determined a deficiency in the income taxes of Harold W. Miller, which was assessed, with interest, in the sum of $4,633.26, based upon the second mortgage notes having a fair market value of twenty-five percent of their face value during that year.

This amount was paid July 31, 1952 and claim for refund timely filed.

6. The Melrose Manor Corporation, a Kentucky corporation, now dissolved, was organized June 22, 1942, and dissolved April 30, 1947. Beginning with its first fiscal year ending May 31, 1943, and each fiscal year thereafter, including its final fiscal period ending April 30, 1947, the corporation reported the second mortgages it acquired during each year, as having no fair market value. It reported in each tax return, as ordinary income, all payments received by virtue of the second mortgage notes acquired in any particular year and for prior years. Every tax return filed by the Melrose Manor Corporation bore this notation, with reference to the second mortgages and payments made in accordance with the second mortgage notes "deferred income collections credited to income as received."

7. Each of the second mortgages in question was inferior to a first mortgage, based on ninety percent of the appraised value of the property offered as security, amortized over a twenty-five year period. No first mortgage was in existence prior to 1942 and in most instances 1943, 1944 and 1945.

8. During the years 1947 through 1950, Harold W. Miller collected on these installment notes, which were distributed to him by the corporation, the following amounts—

| 1947 | | $9,336.84 |
| 1948 | | 16,459.23 |
| 1949 | | 12,540.31 |
| 1950 | | 11,233.87 |
| | Total | $49,600.25 |

9. In its tax return for its fiscal year ending May 31, 1944, the Melrose Manor Corporation reported fifteen second mortgages with a face value of $6,476.32 and reported that such second mortgages had no fair cash market value, noting on its tax return that second mortgages were "Deferred income—Collections credited to income as received."

Subsequently, and under date of March 29, 1946, William H. Leavell, Acting Internal Revenue Agent in Charge at Louisville, Kentucky, directed a letter to the corporation, with respect to its return for the fiscal year 1944, which letter is as follows—

"Upon examination of your income tax return(s) for the years indicated above, the conclusion has been reached that (they) should be accepted as filed.

"I am sure you will appreciate that should subsequent information be received which would materially change the amount reported, it will be necessary under existing laws to redetermine your tax liability."

It is contended by the taxpayer here that the Government thereby became es-

topped to assert that any of the second mortgages had any fair market value during the period June 1, 1945 to May 31, 1946, or on the day of dissolution of the Melrose Manor Corporation and their transfer to Harold W. Miller on March 26, 1947.

### Conclusions of Law

I. The Court has jurisdiction of the parties and the subject matter in this case. 28 U.S.C.A. § 1346(a) (1).

■ II. With respect to the claim that the Government became estopped by the letter of William H. Leavell, Acting Internal Revenue Agent, as quoted above, the rule is stated in Orange Securities Corporation v. Commissioner of Internal Revenue, 5 Cir., 131 F.2d 662, 663, as follows—

"While it is true that income taxes are intended to be settled and paid annually each year standing to itself, and that omissions, mistakes and frauds are generally to be rectified as of the year they occurred, this and other courts have recognized that a taxpayer may not, after taking a position in one year to his advantage and after correction for that year is barred, shift to a contrary position touching the same fact or transaction. When such a fact or transaction is projected in its tax consequences into another year there is a duty of consistency on both the taxpayer and the Commissioner with regard to it, whether or not there be present all the technical elements of an estoppel."

However, there seems to be no inconsistency in the position taken by Mr. Leavell and the subsequent position taken by the Commissioner, for the taxpayer was advised that should subsequent information be received which would materially change the amount reported, it would be necessary to redetermine the tax liability. This, according to the Court's construction of the letter, lacks the element of finality which should attain in order to constitute estoppel. This is true because subsequent developments, that is the collection within the four years following the date of Leavell's letter of substantially $50,000 on the second mortgages, indicates that the second mortgages did have a market value.

■ III. Thus we come to the other issue in controversy, that is whether the second mortgage notes had a fair market value during the year 1946 and on April 30, 1947, when they were distributed to Harold W. Miller as the sole stockholder of the corporations upon corporate dissolution.

The Commissioner subsequently determined that such notes had a fair market value of twenty-five percent at the time of their distribution to Miller. The subsequent payments of substantially $50,000 through the year 1950, would indicate that the Commissioner was correct, though it must be readily conceded that the evidence in the case, aside from the agreement as to payments subsequent to 1946, is to the effect that there was no market value on the second mortgages in 1943 and 1944.

Taxpayer relies upon Cambria Development Company v. Commissioner, 34 B.T.A.Reports, 1155 and Ravlin Corporation, 19 B.T.A.Reports, 1112. In the Cambria case, the taxpayer contended that the securities had no fair market value in 1931 and supported this contention by testimony which the Tax Court said was " * * * neither broken down by cross examination nor overcome by countervailing evidence." The Commissioner introduced no evidence. The Tax Board said—

"While there is evidence, as shown by the findings, that in subsequent years substantial collections were made by the petitioner upon these outstanding obligations, this is not enough to support an inference of fair market value in 1931 contrary to the direct statements of the unimpeached witnesses."

The Ravlin case, supra, supports substantially the same proposition. Subsequent, however, to these cases, and as

late as 1950, the Tax Court, at page 1410 of 14 T.C., in the case of T. J. Coffey, Jr., and relying upon the case of Doric Apartment Co. v. Commissioner, 94 F.2d 895, 896; considered the subsequent history of second mortgage notes in determining their value at the prior date of their reception. The Doric case, from the Sixth Circuit, states the rule—

"Where, however, property has no ready or an exceedingly limited market, as is the case made here by the evidence, fair market value may be ascertained upon considerations bearing upon its intrinsic worth. H. H. Miller Industries Co. v. Commissioner, 6 Cir., 61 F.2d 412, 414. There we held that in determining value the Board is not obliged at a later date to close its mind to subsequent facts and circumstances demonstrating it."

The Sixth Circuit relied upon the following from Sinclair Refining Company v. Jenkins Petroleum Process Company, 289 U.S. 689, 53 S.Ct. 736, 739, 77 L.Ed. 1449—

"But a different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within."

In the prior case of H. H. Miller Industries Company v. Commissioner, 61 F.2d 412, 414, our Court of Appeals said—

"We know of no authority to the effect that in determining value of intangible property having no fixed and determinable market value in 1913 the Board is obliged at a later date to close its mind to subsequent facts and circumstances demonstrating value, and none has been cited."

When the Commissioner made the assessment here involved in 1952, he had the advantage of the experience of the second mortgage notes and knew that substantially $50,000 had been paid. With this information, it could not be said that his estimate of value of twenty-five percent of the face amount of the securities was not a fair appraisal. Certainly, it could not be held to be clearly erroneous, because in 1947, the witnesses who testified in this case thought that the securities had no fixed or fair market value.

It is therefore concluded that the Commissioner's assessment should stand and the petition herein should be dismissed. An order to that effect will be tendered by Counsel for the defendant, upon notice.